1   DAVID CLARKE, JR. (*pro hac vice pending*)
    david.clarke@dlapiper.com
2   GEORGE J. GIGOUNAS (SBN 209334)
    george.gigounas@dlapiper.com
3   JENNIFER SQUILLARIO (*pro hac vice pending*)
    jennifer.squillario@dlapiper.com
4   **DLA PIPER LLP (US)**
    555 Mission Street
5   Suite 2400
    San Francisco, California 94105-2933
6   Tel:   (415) 836-2500
    Fax:   (415) 836-2501
7

8   Attorneys for Defendants
    KBS REAL ESTATE INVESTMENT TRUST,
9   INC., KBS HOLDINGS LLC, KBS CAPITAL
    MARKETS GROUP LLC, KBS CAPITAL
10  ADVISORS LLC, PETER M. BREN, CHARLES
    H. SCHREIBER, JR., KEITH HALL, PETER
11  MCMILLAN III and DAVID E. SNYDER

12                  **UNITED STATES DISTRICT COURT**

13

14  **NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION**

15  JUDITH WOODRUFF, individually          **CASE NO. 13      1643**
    and on behalf of all others similarly
16  situated,                              **DEFENDANTS' NOTICE OF
                                           REMOVAL OF ACTION**
17                  Plaintiff,
                                           **[28 U.S.C. §§ 1332(d), 1441, 1446 and
18          v.                             1453]**

19  KBS REAL ESTATE
    INVESTMENT TRUST, INC.; KBS
20  HOLDINGS LLC; KBS CAPITAL
    MARKETS GROUP LLC; KBS              Complaint Filed:      March 5, 2013
21  CAPITAL ADVISORS LLC;              Complaint Served:     March 12, 2013
    PETER M. BREN; CHARLES H.
22  SCHREIBER, JR.; KEITH HALL;
    PETER MCMILLAN III; DAVID E.
23  SNYDER; and DOES 1 through 50,

24                  Defendants.

25

26

27

28

DLA PIPER LLP (US)
SAN FRANCISCO

EAST\55516521.2

NOTICE OF REMOVAL



1  **TO THE CLERK OF THE UNITED STATES DISTRICT COURT, AND TO**

2  **ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

3       **PLEASE TAKE NOTICE THAT,** pursuant to 28 U.S.C. Sections 1332,

4  1367, 1441, 1446 and 1453, defendants KBS Real Estate Investment Trust, Inc.,

5  KBS Holdings LLC, KBS Capital Markets Group LLC, KBS Capital Advisors

6  LLC, Peter M. Bren, Charles H. Schreiber, Jr., Keith Hall, Peter McMillan III and

7  David E. Snyder (collectively the "Defendants") hereby remove the action entitled

8  *Judith Woodruff, Individually and On Behalf of All Others Similarly Situated v.*

9  *KBS Real Estate Investment Trust, Inc., et al.,* Superior Court of the State of

10  California, For the County of Marin, Case No. CIV 1300964 (the "State Court

11  Action"), to the United States District Court for the Northern District of California

12  on the grounds set forth herein.

13  **I.     INTRODUCTION**

14       1.     On or about March 12, 2013, certain of the Defendants received

15  service of a Summons and Class Action Complaint (the "Complaint") in the State

16  Court Action.  A copy of the Complaint is attached hereto as Exhibit "A."

17       2.     The Complaint seeks compensatory damages in favor of the Plaintiff

18  and several putative classes, interest and prejudgment interest, attorneys' fees and

19  expenses, rescission, refund and disgorgement.  (Exhibit A, Prayer for Relief.)

20  Count I of the Complaint purports to be brought on behalf of a putative class (the

21  "Class") consisting of all investors who purchased interests in KBS Real Estate

22  Investment Trust, Inc. ("KBS REIT") during the period between March 5, 2008 and

23  April 10, 2012 and/or all owners of common stock in KBS REIT.  (Exhibit A,

24  Paragraphs 70(a) and 70(c) and Count I.)  Counts II and III of the Complaint

25  purport to be brought on behalf of a putative subclass consisting of all investors

26  who purchased interests in KBS REIT pursuant to its Dividend Reinvestment Plan

27  during the period between March 5, 2008 and April 10, 2012.  (Exhibit A,

28  Paragraph 70(b) and Counts II and III.)

## II.   THIS COURT HAS JURISDICTION UNDER CAFA

3.   Defendants remove the State Court Action to this Court pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. 109-2, § 1(a), 119 Stat. 4 (Feb. 18, 2005), codified under 28 U.S.C. Sections 1332(d) and 1453.  CAFA provides this Court with original jurisdiction over this action and authorizes the Defendants to remove the State Court Action from the California state court to this Court.

4.   CAFA vests district courts with original jurisdiction over putative class actions when the aggregate amount in controversy for all putative class members exceeds $5 million (exclusive of interest and costs) and when any member of the putative class of plaintiffs is a citizen of a state different from any defendant.  28 U.S.C. § 1332(d)(2).  These requirements are satisfied in this action, as set forth below.

5.   Neither the permissive nor mandatory provisions of CAFA for declining original jurisdiction are applicable to this action.  Accordingly, as discussed further below, federal jurisdiction is mandatory under CAFA.

6.   This Court is the proper district court for removal because the Superior Court of the State of California, for the County of Marin, is located within the Northern District of California.

### A.   This is a Putative Class Action.

7.   This action is a putative civil class action under 28 U.S.C. Section 1332(d)(2) and may be removed to this Court under 28 U.S.C. Section 1453(b).  A "class action," as defined by CAFA, is:

> any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar state statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action.  (28 U.S.C. §§ 1332(d)(1)(B), 1453(a).)

8.   As described in Paragraph 2 above, Plaintiff Judith Woodruff (the "Plaintiff") filed the State Court Action as a putative class action on behalf of

herself and the Class under California Code of Civil Procedure Section 382.  (*See* Exhibit A, ¶ 70.)  Class actions are permitted under California law pursuant to California Code of Civil Procedure Section 382, which is analogous to Federal Rule of Civil Procedure 23.

**B.    The Requisite Amount Is in Controversy.**

9.    CAFA confers jurisdiction over class actions "in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(2).  Furthermore, "[i]n any class action, the claims of individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(6).  CAFA's amount in controversy requirement is satisfied here because, on the face of the Complaint, the monetary relief sought by the Plaintiff and the Class exceeds the statutory threshold.

10.    The Complaint does not state a specific amount in controversy, but that omission cannot prevent removal under CAFA.  *See* 28 U.S.C. § 1446(c)(2) (notice of removal may assert amount in controversy if pleading seeks a money judgment, but State practice either does not permit demand for a specific sum or permits recovery of damages in excess of the amount demanded).

11.    Here, the Complaint alleges that there are "hundreds, if not thousands, of members of the class who purchased the Company's common stock" and that "over 171,109,494 shares were sold in the primary offering for gross offering proceeds of $1.7 billion."  (Exhibit A, ¶71.)  The Complaint seeks compensatory damages, rescission, refund of monies paid and disgorgement of "ill-gotten monies."  (Exhibit A, Prayer for Relief (b), (d).)  Thus, although Defendants deny any liability, the requisite amount is in controversy.

### C.     The Requisite Diversity is Present.

12.     Under CAFA, diversity is satisfied when "any member of a class of plaintiffs is a citizen of a State different from any defendant." (28 U.S.C. §1332(d)(2)(A).)  Diversity is satisfied here.

13.     CAFA provides for diversity jurisdiction under Federal Rules of Civil Procedure, Rule 23, where any member of a class of plaintiffs is a citizen of a State different from any defendant, i.e., where there is diversity of citizenship between any one plaintiff class member and any one defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

14.     The Plaintiff does not specify her state of residence in the Complaint. (Exhibit A, ¶ 4.)  She does allege that she is a KBS shareholder and has been since April 7, 2008.  (Id., ¶ 17.)  The Defendants' shareholder records indicate that the Plaintiff resides in Irving, New York and purchased shares in the state of Arizona. *See DiMeglio v. Italia Crociere Internazionale*, 502 F. Supp. 316, 319 (1980) (for purposes of removal to federal court, defendant should ascertain plaintiff's citizenship if not stated in pleadings).  Accordingly, the Defendants are informed and believe and therefore allege that the Plaintiff is a citizen of the State of New York.

15.     The Plaintiff alleges that the putative class contains "hundreds, if not thousands" of members who are located in "geographically dispersed areas." (*See* Exhibit A, ¶ 71.)  The Defendants' shareholder records indicate that the members of the Class are located in numerous states throughout the United States, and that fewer than one-third of such individuals are citizens of the State of California.

16.     Defendant KBS REIT is a Maryland corporation with its principal place of business in Newport Beach, California.  (KBS REIT does not, contrary to an allegation in Paragraph 18 of the Complaint, have offices in San Rafael, California.)  Defendant KBS Holdings, LLC is a Delaware limited liability company with its principal place of business in Newport Beach, California.

1   Defendant KBS Capital Markets Group LLC is a California limited liability

2   company with its principal place of business in Newport Beach, California.

3   Defendant KBS Capital Advisors LLC is a Delaware limited liability company with

4   its principal place of business in Newport Beach, California.

5       17.    Defendant Peter M. Bren is a citizen of the State of New York.

6   Defendant Charles H. Schreiber is a citizen of the State of California.  Defendant

7   Keith Hall is a citizen of the State of California.  Defendant Peter McMillan III is a

8   citizen of the State of California.  Defendant David E. Snyder is a citizen of the

9   State of California.

10       18.    CAFA's diversity of citizenship requirement is satisfied.  The

11   Defendants are citizens of multiple states (at least California, Maryland, Delaware,

12   and New York).  The Defendants are informed and believe that the Plaintiff is a

13   citizen of the State of New York.  Members of the Class are citizens of numerous

14   states.  Therefore, at least one member of the Class is a citizen of a state different

15   from at least one defendant, within the meaning of 28 U.S.C. §1332(d)(2)(A).

16       19.    The diversity that exists in this action not only satisfies the minimal

17   diversity of citizenship requirement under CAFA, but also precludes application of

18   the exceptions set forth in 28 U.S.C. Sections 1332(d)(3) and (d)(4) because fewer

19   than one-third of the members of the Class are citizens of the State of California.

20   **III.   THE REQUIREMENTS OF 28 U.S.C. § 1446 ARE MET**

21       **A.   This Notice of Removal Is Timely Filed.**

22       20.    The Defendants have timely filed this Notice of Removal within 30

23   days of the date on which certain of the Defendants first received the Summons and

24   Complaint.  *See* 28 U.S.C. § 1446(b).  Copies of the notices of service are attached

25   hereto as Exhibit "B."

26       **B.   Other Procedural Requirements.**

27       21.    Section 1446(a) requires a removing party to provide this Court a copy

28   of all "process, pleadings and orders" served on it in the State Court Action.  A

1    copy of the Complaint is attached as Exhibit "A."  A copy of the Summons is
2    attached as Exhibit "C."  Copies of the Civil Case Cover Sheet and all other papers
3    served on Defendants are attached hereto as Exhibit "D."  The Defendants have not
4    yet responded to the Complaint.

5        22.    Exhibits A, C, and D constitute all of the pleadings, process and orders
6    in the State Court Action.

7        23.    Pursuant to 28 U.S.C. Section 1446(d), the Defendants are
8    simultaneously filing a copy of this Notice of Removal of Action with the state
9    court in the State Court Action.

10       24.    By virtue of this removal, none of the Defendants waives the right to
11   assert any personal jurisdictional defense or other motions including Rule 12
12   motions and/or motions to compel arbitration permitted by the Federal Rules of
13   Civil Procedure.

14       WHEREFORE, the Defendants respectfully submit that CAFA applies to this
15   action because (i) the Class contains over 100 members, (ii) at least one member of
16   the Class is a citizen of a state different from at least one Defendant, (iii) the
17   aggregate amount in controversy exceeds $5 million based upon the allegations of
18   the Complaint, and (iv) the requirements of 28 U.S.C. § 1446 are met.  For these
19   reasons, this action is properly removed to this Court.

20
21
22
23
24
25
26
27
28

1   Dated:  April 11, 2013

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DLA PIPER LLP (US)**

By _____
DAVID CLARKE, JR.
GEORGE J. GIGOUNAS
JENNIFER SQUILLARIO

Attorneys for Defendants KBS REAL
ESTATE INVESTMENT TRUST, INC.,
KBS HOLDINGS LLC, KBS CAPITAL
MARKETS GROUP, KBS CAPITAL
ADVISORS, LLC, PETER M. BREN,
CHARLES H. SHREIBER, JR., KEITH
HALL, PETER MCMILLAN III and
DAVID E. SNYDER

# EXHIBIT A

1  MARK C. MOLUMPHY (#168009)
2  MATTHEW K. EDLING (#250940)
   COTCHETT, PITRE & McCARTHY, LLP
3  840 Malcolm Road, Suite 200
   Burlingame, CA 94010
4  Telephone: (650) 697-6000
   Fax: (650) 697-0577
5
   Jeffrey C. Block
6  Whitney E. Street
7  Leigh E. O'Neil
   BLOCK & LEVITON LLP
8  155 Federal Street, Ste. 1303
   Boston, MA 02215
9  Telephone: (617) 398-5600
   Fax: (617) 507-6020
10

11 *Attorneys for Plaintiff Judith Woodruff, Individually and*
   *on behalf of all others similarly situated*
12

13              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**
                          **COUNTY OF MARIN**
14

15 JUDITH WOODRUFF, Individually      No.  CIV 1300964
16 and On Behalf of All Others Similarly
   Situated,                          **CLASS ACTION COMPLAINT**
17
                  Plaintiff,          **JURY TRIAL DEMANDED**
18
19        v.
20 KBS REAL ESTATE INVESTMENT
   TRUST, INC.; KBS HOLDINGS,
21 LLC; KBS CAPITAL MARKETS
   GROUP; KBS CAPITAL
22 ADVISORS, LLC; PETER M. BREN;
   CHARLES H. SHREIBER, JR.;
23 KEITH HALL; PETER MCMILLAN
   III; and DAVID E. SNYDER, and
24 DOES 1 through 50.
25
                  Defendants.
26
27
28
   CLASS ACTION COMPLAINT

FILED

MAR – 5 2013

KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By: J. Dale, Deputy

**TABLE OF CONTENTS**

PAGE

I     INTRODUCTION ..................................................................................................... - 1 -

II.    NATURE OF THE ACTION .................................................................................. - 1 -

III.   JURISDICTION AND VENUE ............................................................................. - 4 -

IV.   PARTIES ................................................................................................................ - 5 -

V.    FACTUAL ALLEGATIONS .................................................................................. - 8 -

    A.   The True Motivation Behind KBS REIT Distributions ................................. - 15 -

    B.   The Advisor and Individual Defendants ....................................................... - 16 -

    C.   The Dividend Reinvestment Plan .................................................................. - 19 -

VI.   CLASS ACTION ALLEGATIONS ....................................................................... - 20 -

    COUNT I ............................................................................................................... - 21 -

    COUNT II .............................................................................................................. - 22 -

    COUNT III ............................................................................................................. - 23 -

VII.  PRAYER FOR RELIEF ......................................................................................... - 24 -

VIII. JURY TRIAL DEMANDED ................................................................................... - 25 -

## I.     INTRODUCTION

1.     Plaintiff, Judith Woodruff ("Plaintiff"), by her undersigned attorneys, alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based on the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of announcements issued by KBS REIT Inc. ("KBS" or the "Company") and its affiliates, wire and press releases published by or regarding KBS, press releases and letters published by the Financial Industry Regulatory Authority, documents filed with the U.S. Securities and Exchange Commission ("SEC") and other information readily obtainable on the internet.

## II.     NATURE OF THE ACTION

2.     This is a class action brought on behalf of investors who purchased KBS common stock pursuant to the public offering occurring between March 5, 2008 and April 10, 2012 (the "Class")pursuant to the Dividend Reinvestment Plan offering between February 19, 2008 and April 10, 2012 ("the DRP class"); and all KBS shareholders against KBS, its affiliates and certain of their officers and directors for violations of California statutory and common law and against KBS' officers and directors for breaching their fiduciary duty of loyalty and care.

3.     KBS is a real estate investment trust ("REIT"). The purpose of a REIT is to pool the capital of many investors in order to purchase and manage real property that produces a stream of income. Investors purchase shares in the REIT and are paid a regular dividend based on the income produced by the real property assets. Investors also benefit from the appreciation of the assets over time.

4.     In order to qualify as a REIT, the company must affirmatively elect to be taxed as a REIT and must satisfy a number of requirements. For one, the company must distribute 90% of its net income to shareholders annually. In addition, the company must derive 75% of its gross income from investments in real property.

5.     The REIT structure offers a number of benefits, in particular favorable tax treatment. More specifically, REITs do not pay tax at the corporate level; rather, investors are taxed at their individual tax rate for the ordinary income portion of the dividend. REITs also offer investors (a)

1   regular dividends, (b) a more liquid position as compared to purchasing real estate directly, and (c)
2   diversification through the ability to own a variety of property types in geographically diverse areas.

3       6.    "Non-traded REITs" are not registered for trading on any exchange.  As a result,
4   their share prices do not fluctuate with changes in the portfolio or economic conditions and are not
5   closely monitored by securities analysts.  Investors in non-traded REITs generally expect the
6   sponsor to list the shares on a national securities exchange within a five to seven year period.

7       7.    To achieve a promised return on their principal, investors depend on accurate
8   accounting of the REIT business and legitimate, transparent operations.  Investors who seek to sell
9   non-traded REIT shares before such shares are listed on a national exchange are limited to either:
10  (i) reselling (usually at a discount) to the sponsor, an option that is only available if the sponsor has
11  a redemption program in place; or (ii) reselling in an inefficient secondary market, which usually
12  results in a severe discount.

13      8.    Until recently, Plaintiff reasonably believed that KBS was performing satisfactorily
14  and would and could continue paying dividends, and that she was likely to recover her principal at
15  the end of the investment term.  Given that KBS was a non-traded REIT, there was no public
16  market to provide a check on the value of KBS.  Plaintiff could not have learned the truth about
17  KBS's operations before the Company suspended its dividend payments in March 2012 and
18  announced that KBS's common stock, sold to Plaintiff and other members of the Class during the
19  offering for $10.00 per share, was now valued at $4.88 per share, *a decline of more than 50%* that
20  represents a loss of approximately $850 million to the Company's shareholders.

21      9.    KBS and Defendants herein sold shares in the KBS REIT through materially false
22  and misleading statements to Plaintiff and members of the class.  Defendants touted that KBS
23  would operate according to its stated objective to "provide [shareholders] attractive and *stable cash*
24  *distributions* and *preserve and return [shareholders'] capital contributions.*"  Defendants further
25  claimed that they would "*use substantially all of the net proceeds from the Offering to invest in a*
26  *diverse portfolio of real estate assets* . . ." and that the KBS REIT would be managed prudently and
27  conservatively.  These statements were materially misleading when they were made.  Defendants
28  did not use substantially all of the net proceeds from the offerings of KBS shares to invest in a

diverse portfolio of real estate assets; instead, proceeds from sales of additional shares of KBS REIT were used to pay dividends to existing investors to make KBS REIT appear to be a safe and well-performing REIT. Moreover, Defendants failed to operate the KBS REIT to preserve investors' capital; instead, Defendants paid out investors' capital as dividends to make it appear that KBS was a well-performing REIT.

10.. Thus, Contrary to their public statements, and in breach of their duties owed to the Plaintiff and other members of the Class, Defendants did not operate, and have not operated, KBS in such a manner as to maximize current and long-term net income and the value of the REIT's assets. At no point did KBS legitimately follow the investment objectives of providing stable cash distributions and returns to shareholders on capital contributions. Indeed, during the relevant time period, Defendants were paying unsustainable distributions to the investors in amounts that exceeded the operating income generated from the properties and were repurchasing shares at an inflated value in order to prevent the development of a secondary market, which would have revealed the true value of the Company's stock. Further, Defendants did not fairly inform investors that the Company's investment strategies would result in a loss of a substantial portion of investors' principal unless the acquired properties appreciated greatly in value.

11. Defendants paid distributions despite a lack of sufficient cash flows from operations, and hid the true value of KBS REIT shares, in order to attract investors to their follow-up REITs, KBS REIT II and KBS REIT III. Defendants made over $198 million dollars in selling commissions and dealer manager fees to KBS affiliates alone, by forming and selling additional REITS to new investors. By prematurely paying distributions to KBS REIT shareholders, Defendants established the appearance of a track record of steady returns to investors to induce investments in KBS REIT II and KBS REIT III. In reality, about a year after the KBS REIT II offering ended, Defendants ceased paying distributions to KBS REIT shareholders and admitted that the KBS REIT shares had lost over half of their initially represented value. Defendants breached their duty of loyalty to Plaintiff and the class as they declared and paid dividends from new investors' money despite the fact that KBS had insufficient profits from operations to cover the

1  dividend payments, and did so for the sole purpose of allowing them to form and sell new REITs

2  thereby pocketing millions in offering fees and commissions.

3       12.   KBS REIT's assurances convinced investors to participate in the offerings for KBS

4  REIT I, KBS REIT II and KBS REIT III raising roughly $3.7 billion.  The following chart shows

5  the opening and closing dates for each of the Company's offerings:

6

7

| Offering Schedule | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | Present | Number Shares Sold | Amount Raised |
| KBS. REIT I | 1/27/06 opens | | 5/30/08 closes | | | | | | 171,109,494 | $1.7 billion |
| KBS REIT II | | | 4/22/08 opens | | 12/31/10 closes | | | | 179,185,669 | $1.8 billion |
| KBS REIT III | | | | | | 3/24/11 opens | | Offering through 10/26/13 | 20,971,445 | $208.9 million |

14       13.   By soliciting the investments of the Plaintiff in the non-registered REIT, Defendants

15  assumed a duty to deal fairly and forthrightly with the Plaintiff.  The practice and course of conduct

16  described in this complaint are a direct violation of that duty and Defendants knew that Plaintiff and

17  the other members of the Class were likely to be misled by their actions, causing financial injury.

18  Plaintiff brings this action individually and on behalf of all other persons or entities that purchased

19  or acquired shares in KBS and suffered losses and damages as a result of Defendants' violations of

20  law.

21              **III.   JURISDICTION AND VENUE**

22       14.   The claims alleged herein arise under Sections 25400-25403 and 25500-25501 of the

23  California Corporations Code and the California common law for breach of fiduciary duty.

24       15.   This Court has jurisdiction over the subject matter of this lawsuit pursuant to

25  California Code of Civil Procedure § 410.10.  Damages exceed the jurisdictional minimum of this

26  Court.

27       16.   Venue is proper in this Court as Defendant KBS Real Estate Investment Trust, Inc.

28  maintains its principal place of business in California, Defendant KBS Capital Markets Group, LLC

---

**CLASS ACTION COMPLAINT**                                          - 4 -

1 │ is a California limited liability company, all other Defendants have conducted or transacted business

2 │ in the State of California, and many of the acts and practices complained of herein occurred in

3 │ substantial part in California.

4 │ <center>**IV.   PARTIES**</center>

5 │ 17.   Plaintiff, Judith Woodruff, purchased 1,200 shares of KBS stock on April 7, 2008,

6 │ continues to own those shares and has been damaged thereby.

7 │ 18.   Defendant KBS Real Estate Investment Trust, Inc. is a Maryland corporation with

8 │ offices in San Rafael and Newport Beach, California.  The Company was formed on June 13, 2005

9 │ for the purpose of operating as a real estate investment trust ("REIT").

10 │ 19.   Defendant KBS Holdings, LLC is a Delaware limited liability company with

11 │ continuous and systematic business contacts within the State of California.  KBS Holdings, LLC is

12 │ the sole owner of KBS Capital Markets Group, LLC and KBS Capital Advisors, LLC.  KBS

13 │ Holdings is the one hundred percent owner and manager of KBS Capital Markets Group LLC and

14 │ KBS Capital Advisors LLC.  KBS Holdings, LLC is owned equally by three firms: GKP Holding

15 │ LLC (50% owned by Peter McMillian III, 50% owned by Keith D. Hall), PBren Investments, L.P.

16 │ (100% owned by Peter M. Bren) and Schreiber Real Estate Investments, L.P. (100% owned by

17 │ Charles J. Schreiber, Jr.).  KBS Holdings receives selling commissions and asset management fees

18 │ for each KBS REIT offering.

19 │ 20.   Defendant KBS Capital Advisors, LLC, an affiliate of KBS Realty Advisors, LLC

20 │ (collectively the "KBS Advisor"), is a Delaware limited liability company with continuous and

21 │ systematic business contacts within the State of California.  KBS Capital Advisors, LLC is the

22 │ advisor to KBS Real Estate Investment Trust, Inc., and oversees the acquisition, management and

23 │ disposition of the Company's portfolio assets.  KBS Real Estate Investment Trust, Inc. has no

24 │ employees of its own.  Instead, KBS Capital Advisors, LLC manages and conducts the operation of

25 │ the Company pursuant to a written Advisory Agreement and makes recommendations on all

26 │ investments to the KBS Real Estate Investment Trust, Inc.'s Board of Directors.  KBS Capital

27 │ Advisors, LLC receives asset management fees and acquisition fees for each KBS REIT offering.

28 │

**CLASS ACTION COMPLAINT**                                                          -5-

1    21.    Defendant KBS Capital Markets Group, LLC is a California limited liability
2  company. KBS Capital Markets Group, LLC is an affiliate of KBS Capital Advisors, LLC and was
3  retained by KBS REIT as the Dealer Manager to conduct the primary offering of KBS REIT shares.
4  KBS Capital Markets Group receives selling commissions and dealer manager fees for each KBS
5  REIT offering.

6    22.    Defendant KBS Realty Advisors LLC is a Delaware limited liability company with
7  continuous and systematic business contacts within the State of California.  KBS Realty is the
8  investment advisor to KBS-affiliated programs and investors.  KBS Realty Advisors receives fees
9  for each KBS REIT offering.

10    23.    Defendant Peter M. Bren ("Bren") has been the President of KBS Real Estate
11  Investment Trust, Inc., President of KBS Capital Advisors, LLC, Chairman of the Board and
12  President of KBS Realty Advisors, LLC since KBS REIT's inception. Mr. Bren is a resident of New
13  York. Mr. Bren is also the President of KBS REIT II and KBS REIT III, and a member of the KBS
14  REIT II and KBS REIT III Boards of Directors.  Mr. Bren benefitted from the asset management,
15  selling commissions and other fees paid to the KBS affiliates of which he owns over a thirty-three
16  percent stake.

17    24.    Defendant Charles J. Shreiber, Jr. ("Shreiber") has been the Chief Executive Officer
18  of KBS Realty Advisors and its affiliate KBS Capital Advisors, and Chairman of KBS Real Estate
19  Investment Trust, Inc. since the Company's inception.  Mr. Shreiber is also the Chief Executive
20  Officer and Director of KBS REIT II and the Chairman of the KBS REIT II Board of Directors.
21  Mr. Shreiber holds the same positions at KBS REIT III. Mr. Schrieber is a resident of California.
22  Mr. Shreiber benefitted from the asset management, selling commissions and other fees paid to the
23  KBS affiliates of which he owns over a thirty-three percent stake.

24    25.    Defendant Keith Hall ("Hall") is the Executive Vice President of the Board of
25  Directors of KBS Real Estate Investment Trust, Inc. and has been in that position since the
26  Company's inception. Mr. Hall is also the Executive Vice President of KBS REIT II and a member
27  of the KBS REIT II Board of Directors. Mr. Hall holds the same positions at KBS REIT III. Mr.
28

1   Hall is a resident of California.   Mr. Hall benefitted from the asset management, selling
2   commissions and other fees paid to the KBS affiliates of which he owns over a fifteen percent stake.

3       26.    Defendant Peter McMillan, III ("McMillan") is the Executive Vice President of KBS
4   Capital Advisors, and Executive Vice President, Treasurer and Secretary of the KBS Real Estate
5   Investment Trust, Inc., and has held those positions since the Company's inception. Mr. McMillan
6   is the Executive Vice President, Treasurer, Secretary and Director of KBS REIT II. Mr. McMillan
7   is a resident of California. Mr. McMillan benefitted from the asset management, selling
8   commissions and other fees paid to the KBS affiliates of which he owns over a fifteen percent stake.

9       27.    Defendant David E. Snyder ("Snyder") has served as the Chief Financial Officer of
10   the KBS Real Estate Investment Trust, Inc. since 2008. Mr. Snyder was appointed Chief Financial
11   Officer of KBS REIT II and to the Board of Directors in March of 2008. Mr. Snyder is also the
12   Chief Financial Officer of KBS REIT III and a member of the KBS REIT III Board of Directors,
13   and has been in these positions since the inception of KBS REIT II and KBS REIT III. Mr. Snyder
14   is a resident of California and receives salaries from multiple KBS entities.

15       28.    Stacie K. Yamane ("Yamane") has been the Chief Financial Officer and Controller,
16   since the Company's inception. Ms. Yamane is also the Senior Vice President/Controller, Portfolio
17   Operations for KBS Realty Advisors. Ms. Yamane was also the Chief Financial Officer and
18   Controller of KBS REIT II until March of 2008 when she became the Chief Accounting Officer of
19   KBS REIT II. She has been a member of the KBS REIT II Board of Directors since the creation of
20   KBS REIT II. Ms. Yamane serves as the Chief Accounting Officer of KBS REIT III and as a
21   member of the KBS REIT III Board of Directors. Ms. Yamane is a resident of California and
22   receives salaries from each KBS REIT.

23       29.    Hank Adler ("Adler") has served as an Independent Director on the KBS REIT I
24   Board since the Company's inception.   Mr. Adler is also an Independent Director on the Boards of
25   KBS REIT II and KBS REIT III. Mr. Adler has earned well over for $430,000 serving on the
26   Boards of KBS REIT I, KBS REIT II and KBS REIT III. Mr. Adler receives a yearly salary and
27   payments per board meeting from multiple KBS REITs. Mr. Adler is a resident of California.

28

1     30.    Barbara R. Cambon ("Cambon") has served as an Independent Director on the KBS

2  REIT I Board since the Company's inception. Ms. Cambon is also an Independent Director on the

3  Boards of KBS REIT II and KBS REIT III. Ms. Cambon has earned well over $430,000 serving on

4  the Boards of KBS REIT I, KBS REIT II and KBS REIT III. Ms. Cambon receives a yearly salary

5  and payments per board meeting from multiple KBS entities. Ms. Cambon is a resident of

6  California.

7     31.    Stuart R. Gabriel, Ph.D. ("Gabriel") has served as an Independent Director on the

8  KBS REIT I Board since the Company's inception. Mr. Gabriel is also an Independent Director on

9  the Boards of KBS REIT II and KBS REIT III. Mr. Gabriel has earned well over for $430,000

10  serving on the Boards of KBS REIT I, KBS REIT II and KBS REIT III. Mr. Gabriel receives a

11  yearly salary and payments per board meeting from multiple KBS entities. Mr. Gabriel is a resident

12  of California.

13     32.    Defendants Does 1-50 are fictitious names for individuals or entities that may be

14  responsible for the wrongful conduct and practices that caused harm to the Plaintiff and the other

15  Class Members, the true names and capacities of which are unknown to Plaintiff, but Plaintiff will

16  amend this Complaint when and if the true names of said Defendants become known.

17     33.    Plaintiff, upon information and belief, alleges that during the Class Period,

18  Defendants were each the agent and/or joint venturer of the other Defendants, and in performing the

19  acts alleged in this Complaint were acting within the course and scope of that agency and any

20  reference to "Defendant" or "Defendants" shall mean "Defendants and each of them."

21                  **V.    FACTUAL ALLEGATIONS**

22     32.    The Company's initial public offering was pursuant to a Registration Statement,

23  Prospectus and Amended Registration Statement filed with the SEC on June 23, 2005, January 13,

24  2006 and August 10, 2005, and the amendments and supplements thereto (collectively, the

25  "Offering Documents"). The Offering Documents were signed by Charles J. Schreiber, Jr. (Chief

26  Executive Officer and Director), Stacie K. Yamane (Chief Financial Officer and Director), Peter

27  McMillan III (Executive Vice President, Treasurer, Secretary and Director), Hank Adler (Director),

28  Barbara R. Cambon (Director) and Stuart A. Gabriel, Ph.D. (Director).

---

33.     The Offering Documents represented to investors that KBS would qualify as a REIT beginning with the taxable year ending December 31, 2006 and touted that KBS would operate according to its stated objective to "provide [shareholders] attractive and *stable cash distributions* and *preserve and return [shareholders'] capital contributions*." Defendants further claimed that they would "*use substantially all of the net proceeds from the Offering to invest in a diverse portfolio of real estate assets . . .*"[1] KBS also explained its primary investment objectives as follows: "to provide you with attractive and *stable cash dividends*; and *to preserve and return your capital contribution*. We will also *seek to realize growth in the value of our investments* by timing property sales to *maximize asset value*."[2]

34.     In nearly every SEC filing, KBS assured investors that:

> We intend to acquire and manage a diverse portfolio of real estate assets. We plan to diversify our portfolio by property type, geographic region, investment size and investment risk with the goal of attaining a portfolio of income producing real estate and real estate-related assets that *provide attractive and stable returns to investors*.

35.     Indeed, the "Fact Sheet" KBS provided to investors claimed that KBS had a "Distinctive Investment Approach," meaning KBS pursues "an investment strategy that seeks *strong, stable cash flows* – along with the opportunity for enhanced returns – by utilizing a unique investment approach" focused on a target allocation of 70% of investments in well-leased, institutionally-owned office buildings with strong in-place rents and minimal rent rollover.

36.     KBS filings also downplayed the difficulty of selling shares by stating that: "We may return all or a portion of your capital contribution in connection with the sale of the company or the properties we acquire. Alternatively, you may be able to obtain a return of all or a portion of your capital contribution in connection with your shares."

37.     Defendants also claimed that the consolidated financial statements for unaudited interim periods "*include all adjustments necessary to present a fair statement of the results for those periods*."[3]

---

[1] *See* Prospectus at F-4. Emphasis is supplied throughout unless otherwise noted.
[2] *See* Amendment No. 1 to Form S-11 Registration Statement.
[3] *See* Supplement 7 to the Prospectus, dated November 16, 2006.

1       38.    In numerous supplements to the Offering Documents and other filings with the SEC,

2  KBS assured investors that its future prospects were even more promising than the results in the

3  quarterly reports. For example, in the Form 10K dated March 31, 2008, KBS insisted that:

4

5       Our results of operations for the year ended December 31, 2007 are not indicative of

6       those expected in future periods as we expect that rental income and tenant
reimbursements, interest income from real estate loans receivable, parking revenues

7       and other operating income, property operating expenses, asset management fees,
depreciation, amortization and net income will each significantly increase in future

8       periods as a result of owning the assets acquired during 2007 for an entire period and
as a result of anticipated future acquisitions of real estate.

9       39.    Peter M. Bren, President of KBS Real Estate Investment Trust, Inc., President of

10  KBS REIT's advisor, KBS Capital Advisors, LLC and Chairman of the Board and President of

11  KBS Realty Advisors LLC gave an interview to Institutional Investor, Inc. in May of 2007, in

12  which he made numerous false and misleading statements and omitted to disclose material

13  information. The interview was re-published by a number of different sources, including Real

14  Estate Finance and Investment Weekly.

15       40.    During the course of the May 2007 interview, Bren stated that KBS "expects to have

16  $2 billion in equity raised [for the REIT] by the end of the first quarter of 2008." He also claimed

17  that, "We're doing something in the neighborhood of $120 million a month." Mr. Bren also

18  misrepresented that KBS was "averaging on the mezzanine debt side right now 11-12% current cash

19  yield. So that allows us to buy buildings at five [percent cap rates]. We're able to because when

20  you meld the two together we're above the seven percent yield," and "If something does go wrong

21  with the borrower down the road, we just step in immediately and take over the project."

22       41.    Defendant Bren said that the KBS strategy of "melding" the buying of top end assets

23  and buying and originating mezzanine debt on real estate "puts us over the 7%" dividend, and that,

24  "It's very, very exciting to do this. It's a whole new thing." He also stated that, "The standards

25  have tightened up considerably but we're very, very excited about this because it's going to take

26  this froth off the market and allow us to acquire buildings at a more reasonable cap rate, or at least

27  it's going to stabilize it here. [The market has] taken that extremely high leverage buyer out of the

28  market."

42.   Despite Bren's bullish statements about KBS and touting why investors should purchase KBS REIT shares, KBS attempted to downplay some of Bren's statements in an Issuer Free Writing Prospectus dated June 1, 2007, suggesting that investors not place "undue emphasis" on Bren's numerical statements.

43.   Contrary to Defendants' claims that KBS would "preserve and return [shareholders'] capital contributions" and in breach of their fiduciary duties, KBS began paying dividends before cash flow from operations justified those distributions. To do so, KBS entered into an amendment to its Advisory Agreement dated April 28, 2009 pursuant to which the Advisor, an affiliate of KBS, would advance the funds necessary to make the premature dividend payments in return for a substantial asset management fee. Entering into this Advisory Agreement was a breach of the KBS Board's duty of loyalty to Plaintiff and the class.   The only reason why the Board was interested in paying dividends to investors was so Bren and his affiliated KBS entities could tout that KBS REIT was paying a steady stream of dividends which would allow him to sell additional REIT offerings and pocket millions in sales commissions and advisory fees. The Advisory Agreement was not negotiated at arms-length and stood to benefit KBS REIT's controlling partner at the expense of Plaintiff and the class.

44.   Investors, however, understandably interpreted the payment of distributions as a sign that the Company was meeting its investment objectives.  In reality, the funds KBS earned from operations would never catch up to the premature dividend payments.

45.   On March 25, 2009, *less than 10 months following the closing of the Offering Period*, the Company's Board of Directors voted to approve an amended and restated share redemption program, severely curtailing shareholders' rights. Specifically, the Company refused to redeem an investor's shares unless the investor had held the shares for at least one year, except where the shares were being redeemed as a result of the shareholder's death or "qualifying disability." The amended program was subject to additional limitations, including a cap of 5% of the weighted-average number of shares outstanding during the prior calendar year. The Company further informed investors that "Based on the Company's budget expenditures, and except with

1   respect to redemptions sought upon a stockholder's death or qualifying disability, *the Company*

2   *does not currently expect to have funds available for redemption for the remainder of the year.*"[4]

3          46.      Subsequently, on July 9, 2009, Defendants notified investors of the status of its

4   disastrous investments known as the "Arden Investment." In January 2008, KBS had acquired a

5   $144.5 million mezzanine loan on a portfolio of Southern California office real estate. The loan

6   went into default in 2009 and as a result, as of June 30, 2009, KBS determined the fair value of its

7   investment in the Arden Portfolio Mezzanine Loans to be $0.[5]

8          47.      Then, on November 20, 2009, KBS sent a letter to the Company's shareholders

9   notifying them of the following change in applicable financial regulations:

10

11          In February 2009, the Financial Industry Regulatory Authority (FINRA) issued
            FINRA Regulatory Notice 09-09 to broker dealers that sell the shares of non-traded
12          REITs. This notice informs broker dealers that they may not report in a customer
            account statement an estimated value per share that is developed from data more than
13          18 months old, which in effect requires non-traded REITs to provide broker dealers
            with an estimated value per share of their common stock within 18 months of the
14          completion of their offering stage. Although we did not anticipate completing the
            analysis and reporting an estimated value per share of our common stock so soon
15          upon the close of our initial public offering, we are now tasked with reporting an
            estimated value per share of common stock by the end of November 2009.
16

17          48.      As a result of the change in regulations, KBS was forced to re-price the value of its

18   shares for the first time, informing investors on November 20, 2009, of a staggering 29% decline in

19   the value of their shares from $10 per share to approximately $7.17, valued as of September 30,

20   2009." Nonetheless, Defendants continued to tout the Company's strong financial outlook, assuring

21   investors that:

22          Although during the past 24 months market fundamentals have deteriorated along
            with the U.S. economy, resulting in increased vacancy rates throughout a majority of
23          the U.S. office markets as well as a decline in lease rates, we continue to be pleased
            with the strong leasing and occupancy level of KBS REIT's portfolio. This is
24          indicative of the quality of the assets in the portfolio, the strength and quality of the
            tenants in the buildings as well as the exceptional asset management team at KBS
25          Capital Advisors, which is responsible for the operations of the portfolio.
26

27

28
     _____
     [4] *See* Form 8-K filed with the SEC on March 26, 2009.
     [5] *See* Supplement 10 to the Prospectus Dated April 30, 2010.

     **CLASS ACTION COMPLAINT**                                                          - 12 -

49.     Despite Defendants' claims regarding the "strong leasing and occupancy level of KBS's REIT's portfolio," "the quality of assets in the portfolio," "the strength and quality of the tenants" and the "exceptional asset management team," the Company's financial outlook continued to deteriorate. In its 10-Q for the third quarter of 2010, KBS recognized an impairment charge of $123.5 million for 17 properties within the Company's National Industrial Portfolio Joint Venture for the nine months ended September 30, 2010. KBS continued to pay dividends to its investors.

50.     In July of 2011, KBS admitted that, "For the year ended December 31, 2010, we had a net loss of $2.0 million, due primarily to general and administrative costs, operating expenses, depreciation and amortization expenses, real estate acquisition fees to affiliates and non-affiliates, real estate taxes and insurance, and asset management fees to affiliates," but that they expected interest income, rental income and tenant reimbursements to all increase in the future.[6] A close reading of the 2011 quarterly reports, however, warns of decreased occupancy rates and negotiations with the defaulting borrower, Gramercy Capital Corp. ("GKK"), on the original loan for the GKK Properties real estate portfolio.

51.     KBS held the mezzanine loan on the GKK properties and negotiated with GKK to take over both the ownership and financial obligations of the GKK properties to preserve the value of the original KBS investment. Pursuant to the settlement agreement, all of the interest in the GKK properties and related liabilities securing the GKK mezzanine loan were transferred to KBS no later than December 15, 2011. In the process, KBS incurred costs and expenses in excess of $20.4 million dollars. KBS also extended its repo debt secured by interests in the GKK Properties resulting in an outstanding balance of approximately $143 million in remaining obligations.[7]

52.     With costs continuing to outpace income, on March 20, 2012, KBS approved the suspension of monthly distribution payments to "manage [its] reduced cash flows from operations and redirect available funds to reduce [its] debt."

53.     On March 26, 2012, Defendants admitted surpassing the limit of debt stipulated in the Offering Documents in their 2011 Annual Report filed with the SEC:

---

[6] *See* KBS Proxy Statement for 2011 Annual Meeting, dated April 11, 2011.
[7] *See* KBS Letter to Shareholders, dated March 26, 2012.

Our policies do not limit us from incurring debt until our total liabilities would exceed 75 percent of the cost (before deducting depreciation or other noncash reserves) of our tangible assets . . . Due to the amount of debt that we have assumed . . . we exceeded our charter limitation on total liabilities as of Sept. 30, 2011.

KBS REIT I Annual Report, p. 41, (2011).

54.     KBS incurred this massive debt in part by paying dividends without regard to whether those payments were justified by actual operations, simply to attract investors and to keep Defendants' scheme afloat. Investors could not have reasonably learned the Company's dire financial state or the motivation behind management's actions prior to the March 2012 announcement of the cancellation of distributions and notice of exceeding the debt limit.

55.     In addition to the excessive debt-to-assets ratio, the 2011 Annual Report revealed additional material facts concealed or downplayed by the Defendants:

- KBS experienced reduced cash flows from operations of $39.1 million for the year ended December 31, 2011, compared to $53.4 million in cash flows from operations for the year ended December 31, 2010, primarily due to decreases in interest income from real estate loans receivable and increases in expenses;

- KBS took control of the GKK real estate portfolio and related debt when the borrower on the underlying mezzanine loan investment defaulted. KBS was aware that investments with mezzanine financing have higher loan-to-value ratios and less of an equity cushion than investments secured only by first mortgage debt. $15.9 million of the REIT's operating cash flows for the year ended December 31, 2011 were from the GKK Properties and were consequently restricted for the repayment of principal outstanding under "repo debt" obligations secured by the GKK Properties. As of December 31, 2011 the outstanding balance of the repo debt was approximately $143 million dollars and with a repayment date by April 28, 2013, resulting in a suspension of KBS dividend payments. KBS cannot access the net operating cash flows of the GKK Properties until the repo debt is entirely paid;

- KBS recognized $164.8 million of write downs due to the depreciation of the assets in KBS's portfolio;

- KBS recognized $137.6 million of estimated value decreases on debt investments due to lenders choosing to foreclose on equity interests at maturity rather than extend loans as anticipated, thereby causing a decrease in the value of KBS investments;

- KBS was terminating all distributions and suspending redemption units, providing redemptions only upon a stockholder's death, "qualifying disability" or "determination of incompetence," and even such redemptions were subject to annual dollar maximums and further limitations;

1        •  KBS terminated its dividend reinvestment plan, effective April 10, 2012; and

2      56.   As a result, KBS unilaterally cut its valuation per share in the REIT to $5.16, almost

3 half of the original value.

4     **A.  .  The True Motivation Behind KBS REIT Distributions**

5      57.   Defendants hid the true value of the KBS REIT shares and paid unjustified dividends

6 in order to create a history of returns to shareholders that would appeal to future investors.

7 Defendants intended to operate similar REITs and used the purported success of the KBS REIT as a

8 selling point for KBS REIT II and KBS REIT III. The KBS REIT II offering ended in December

9 2010, and by March of 2012 KBS REIT I stopped paying distributions to its investors and revealed

10 the decrease in share value of over fifty percent. KBS REIT distributions were unjustifiably paid

11 out of capital contributions for as long as necessary to show that KBS REIT was purportedly a safe

12 and sound investment so as to permit the closing of KBS REIT II, but dividends were cut after the

13 Defendants bankrolled their next endeavor. Defendants paid unsustainable dividends in KBS REIT

14 I for the purpose of making the investment appear attractive so they could sell shares in additional

15 REITs. This, however, damaged KBS REIT and this mismanagement led to the decline in value of

16 KBS REIT.

17     58.   Defendants made millions in selling commissions and asset management fees from

18 the KBS REIT II and REIT III offerings:

| | # Shares Sold (as of 12/31/2011) | Amount Raised (as of 12/31/2011) | Asset Management Fees 2009-2011 (in thousands) | Real Estate Acquisition Fees 2009-2011 (in thousands) | Selling Commissions and Dealer Manager Fees (as of 12/31/2011) (in thousands) |
|---|---|---|---|---|---|
| KBS REIT II | 182,681,633 | 1.8 billion | 34,614 | 19,295 | 187, 438 |
| KBS REIT III | 10,448,043 | 104.0 million | 178 | 836 | 14,584 |

1     59.     Because KBS shares were not publicly traded, and due to Defendants' amendments
2  to the share redemption program, Plaintiff and other members of the Class were essentially locked
3  in after their purchases and could not sell shares at a reasonable rate or react in a self-preserving
4  manner.  Even before all of the detrimental investments came to light, Plaintiff and other class
5  members could only sell their shares at a severe discount on a secondary market, and only then if
6  the prospective buyer met the applicable suitability and minimum purchase standards contained in
7  the Prospectus.  By the time KBS informed the investors of the true value of its portfolio and the
8  termination of dividends, investors held illiquid and nearly worthless interests in the REIT.

9     **B.     The Advisor and Individual Defendants**

10    60.     KBS has no employees and its business is managed by KBS Capital Advisors, LLC.
11  During the class period, dividends in excess of 75 percent of KBS REIT's operating cash flow were
12  declared.  Since the inception of the KBS REIT, the Individual Defendants controlled the
13  management, policies and public statements regarding the KBS REIT through their individual
14  actions and through KBS Capital Advisors, LLC.   The Individual Defendants were each
15  participants, agents, aiders and abettors in the improper acts, schemes and transactions that form the
16  basis of this lawsuit.

17    61.     Since 2006, KBS and the Advisor have acquired billions of dollars worth of real
18  estate.  While KBS suspended its dividends and cancelled redemption requests, *it still paid over $62*
19  *million to the Advisor in the past few years alone.*

20

<div align="center">

**Fees to Affiliates**
(in thousands)

</div>

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | Paid to: |
|---|---|---|---|---|---|---|---|
| Asset Management Fee | 369 | 5,095 | 17,508 | 16,460 | 15,228 | 14,546 | KBS Capital Advisors |
| Changes in Operating Assets and Liabilities – Due to Affiliates | --- | --- | --- | 2,037 | 514 | 6,995 | KBS Capital Advisors |
| Reimbursement of Operating Expenses | 212 | --- | --- | 292 | 38 | 94 | KBS Capital Advisors |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Disposition Fees | | | | — | 726 | 2,089 | KBS Capital Advisors |
| Selling Commissions | 6,319 | 41,434 | 49,979 | 1,494 | 1,160 | 1,115 | KBS Capital Markets Group |
| Dealer Manager Fees | 3,922 | 25,527 | 30,100 | — | — | — | KBS Capital Markets Group |
| Acquisition Fees | 1,696 | 10,318 | 9,686 | — | — | — | KBS Capital Advisors |
| Reimbursable Other Offering Costs | 3,773 | 4,338 | 2,918 | 79 | — | — | KBS Capital Advisors |
| Totals | 16,291 | 86,712 | 110,191 | 20,362 | 17,666 | 24,839 | |

62.     Moreover, Defendants' self-dealing is evident in KBS's failure to disclose numerous risks relating to the significant conflicts of interest amongst its affiliates, executive officers and directors.  The Individual Defendants each serve as an Officer or Director of more than one KBS affiliate. The compensation arrangements amongst these entities are extremely adverse to the shareholders.  Millions of dollars in fees have been paid to the Advisor in the form of excessive compensation, manager fees, increased acquisition and asset management fees, and disposition fees upon sales, all while breaching duties owed to the Plaintiff and the Class.  (In response to investor backlash, the Advisors have agreed to forego certain of these fees and payments.)  Moreover, the fees the Advisor receives in connection with transactions involving the purchase and management of a property are based on the cost of the investment and not based on the quality of the investment or the quality of the services rendered, which encourages the Advisor to recommend higher-priced transactions, which inherently increases KBS's risk profile.  The interconnectedness amongst the KBS entities is clarified in the following chart:

| Peter McMillan III (1) | Keith D. Hall (2) | Peter M. Bren (3) | Charles J. Schreiber, Jr. (4) |
|---|---|---|---|
| 50% Owner | 50% Owner | 100% Owner | 100% Owner |

| GKP Holding LLC | PBren Investments, L.P. | Schreiber Real Estate Investments, L.P. |
|---|---|---|
| 33 1/3% Owner | 33 1/3% Owner | 33 1/3% Owner |

**KBS Holdings LLC**

100% Owner/Manager          100% Owner

| KBS Capital Markets Group LLC | KBS Capital Advisors LLC |
|---|---|
| Dealer Manager Agreement | Advisory Agreement |

**KBS Real Estate Investment Trust III**

63.    The Independent Directors were incentivized to approve the payment of cash distributions to enable the creation of future KBS REIT offerings since they all serve as Independent Directors on the KBS REIT II and KBS REIT III Boards and receive an annual retainer and per meeting payments from each KBS REIT. For serving on the KBS REIT Board of Directors, each Independent Director receives a $40,000 annual retainer, $2,500 per board meeting, $2,500 per committee meeting, 2,000 per teleconference meeting and expenses incurred for attendance at the meeting. Each Independent Director then receives the same amounts for participation on the KBS REIT III Board of Directors. For serving on the KBS REIT II Board of Directors, the Independent Directors receive a $25,000 annual retainer, $2,500 per board meeting, $2,000 per committee

**CLASS ACTION COMPLAINT**                                                      - 18 -

1 | meeting, $1,000 per teleconference meeting and reimbursement of expenses for meeting attendance.
2 | Consequently, the creation of subsequent KBS REITs provided additional positions and income for
3 | each of the Individual Defendants.

4 |     **C.**    **The Dividend Reinvestment Plan**

5 |     64.    Beginning in 2006, Defendants commenced offering up to 80,000,000 shares through
6 | their Dividend Reinvestment Plan ("DRP"), and had sold 28,206,105 shares worth over 222.6
7 | million dollars as of the closing of the DRP Offering on April 10, 2012. Despite the decline in
8 | value of the KBS investments and share price, KBS charged investors $9.50 per share for the
9 | entirety of the Dividend Reinvestment Program Offering period.

10 |     65.    The Form S-3 filed with the SEC on September 25, 2008 admits that Defendants "set
11 | the offering price of our shares arbitrarily. This price is unrelated to the book or net value of our
12 | assets or to our operating income." The Form S-3 was updated periodically through July 3, 2012,
13 | but the share price was never adjusted.

14 |     66.    Although Defendants disclosed that the Board "arbitrarily priced" the DRP shares,
15 | they misled investors by disclosing that "three years after the completion of our offering stage,
16 | shares issued pursuant to our dividend reinvestment plan will be priced at the estimated value per
17 | share of our common stock, as determined by our advisor or another firm chosen for that purpose."
18 | Thus, Defendants' implicit representation was that the $9.50 per share price was based on the
19 | estimates of the per share value of the KBS common stock.

20 |     67.    Despite acknowledging the unprecedented decline in the real estate industry and
21 | cutting the value of the common stock share price, Defendants failed to re-price the DRP shares
22 | sold to its investors.

23 |     68.    As a result, the sale of the DRP shares continued at an artificial level, harming the
24 | investors in the DRP Class, but providing the KBS Advisors with over twenty-five million dollars
25 | in asset management and dealer manager fees through the DRP Offering alone.

26 |     69.    In choosing to invest in the Company, Plaintiff relied on Defendants to make
27 | accurate disclosures in order to enable Plaintiff to evaluate the investment objectives of KBS and
28 | the risks associated with the offering. As a direct result of Defendants' misconduct, Plaintiff and

1    other members of the Class have suffered significant financial harm in connection with their
2    purchase of KBS securities.

3                          VI.    CLASS ACTION ALLEGATIONS

4        70.    Plaintiff brings this action as a class action pursuant to California Code of Civil
5    Procedure Section 382:

6        (a)    on behalf of investors who purchased interests in KBS REIT during the period
7              between March 5, 2008 and April 10, 2012;

8        (b)    on behalf of all investors who purchased interests in KBS REIT through the
9              Dividend Reinvestment Plan during the period between March 5, 2008 and April 10, 2012;
10             and

11       (c)    on behalf of all owners of KBS common stock.

12       71.    The members of the Class are located in geographically dispersed areas and are so
13   numerous that joinder of all members is impracticable.  Although the exact number of Class
14   members is unknown at this time and can only be ascertained through appropriate discovery,
15   Plaintiff believes there are hundreds, if not thousands, of members of the Class who purchased the
16   Company's common stock pursuant to the IPO.  In fact, over 171,109,494 shares were sold in the
17   primary offering for gross offering proceeds of $1.7 billion and, as of December 31, 2011, an
18   additional 26,592,090 shares had been sold under the dividend reinvestment plan for gross offering
19   proceeds of $222.6 million.

20       72.    Common questions of law and fact exist as to Plaintiff and to all members of the
21   Class and predominate over any questions affecting solely individual members of the Class.
22   Among the questions of law and fact common to the Class are:

23       (a)    whether the Registration Statement, Prospectus and the supplements thereto
              contained untrue statements of material facts and omissions about KBS;
24

25       (b)    whether each of the Defendants breached fiduciary duties owed to the Class;

26       (c)    whether the members of the Class have sustained damages and, if so, the proper
              measure of damages;
27

28       (d)    whether the Individual Defendants are personally liable to the Plaintiff and Class
              members based upon their acts; and

(e)     whether the Plaintiff and Class members are entitled to a reasonable award of attorneys' fees, interests and costs.

73.     Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of California law as complained of herein.

74.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to, or in conflict with, those of the Class.

75.     A class action is superior to alternative methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### (By the Class Against the Individual Defendants)
### Breach of Fiduciary Duty of Loyalty

76.     Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set forth herein.

77.     The Individual Defendants comprise KBS' Board of Directors and each owed Plaintiff and Class members a duty to act in the best interests of KBS and not their own personal interests.  The Individual Defendants had a fiduciary duty to deal fairly with Plaintiffs and Class members and to communicate promptly to them all material facts they knew or should have known about the true nature of the investments in KBS.

78.     Defendants breached their duty of loyalty to Plaintiff and the class by declaring and causing KBS to pay dividends to investors that were not supported by KBS' profitability.  Defendants also breached their duty of loyalty by agreeing to the November 8, 2006 Agreement.  The Individual Defendants caused KBS to enter into the Advisory Agreement and to pay dividends

1  from borrowed funds or newly invested capital for the purpose of making KBS appear to be a safe,
2  secure and well-performing REIT so Bren and the KBS entities he controlled could market and sell
3  additional REIT offerings and earn almost $200 million in selling fees, commissions and additional
4  management fees.  The Advisory Agreement was not negotiated at arms-length and was unfair to
5  KBS investors.

6      79.    The Individual Defendants breached their duty of loyalty to Plaintiff and the class by
7  mismanaging KBS and causing it to enter into unfair agreements with KBS Advisor and KBS
8  Capital Markets and other entities owned and controlled by Bren.  The Individual Defendants
9  caused KBS to fail to manage KBS as promised, to "provide [shareholders] attractive and *stable*
10  *cash distributions* and *preserve and return [shareholders'] capital contributions.*"  Defendants
11  further claimed that they would "*use substantially all of the net proceeds from the Offering to*
12  *invest in a diverse portfolio of real estate assets . . .*"  Instead, the Individual Defendants
13  mismanaged KBS by declaring dividends without a sufficient level of profitability so that KBS
14  would appear as a safe and well-performing REIT so Bren could sell shares in new REITs and
15  pocket tens of millions of dollars in additional selling commissions and management fees.

16
17  ## COUNT II
18  **(By the DRP Class Against All Defendants)**
   **Violation of Cal. Corp. Code §§25401 and 25501**

19      80.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set
20  forth herein.

21      81.    California Corporation Code §25401 provides that it is unlawful for a person to offer
22  or sell a security by means of any written or oral communication that includes an untrue statement
23  of material fact or omits the statement of material fact necessary to make the statements made, in
24  light of the circumstances under which they are made, not misleading.

25      82.    California Corporation Code §25501 provides that any person who violates §25401
26  shall be liable to any other person who purchases a security from him, who may sue for rescission
27  or damages.

28

---

**CLASS ACTION COMPLAINT**     - 22 -

1    83.    As detailed above, in offering and selling the securities referred to herein,

2  Defendants, and each of them, made untrue statements of material fact and omitted to state material

3  facts to investors and potential investors. Those statements are identified in paragraphs 25 to 35.

4    84.    The misstatements and omissions referred to herein were "material facts" within the

5  meaning of Corp. Code §25401 because they were facts that a "reasonable investor" would consider

6  in deciding whether to invest.

7    85.    Defendants' offer and sale of securities were by means of misrepresentations and

8  omissions within the meaning of §25401.

9    86.    Defendants' misrepresentations and omissions of material fact took place "within the

10  state" of California within the meaning of Corp. Code §25008.

11    87.    Defendants' conduct constitutes a violation of California Corporations Code

12  §§25401 and 25501.

13    88.    As a direct and proximate result of Defendants' conduct Plaintiff has suffered

14  damages.

15    89.    Unless enjoined by this Court, Defendants will continue to violate §25401.

16                                **COUNT III**

17                    **(By the DRP Class Against All Defendants)**
                **Violation of Cal. Corp. Code §§25400, 25403 and 25500**

18

19    90.    Plaintiff repeats and re-alleges each of the allegations set forth above as if fully set

20  forth herein.

21    91.    California Corporation Code §25400(d) makes it unlawful for a person to offer or

22  sell a security by means of any written or oral communication which contains a statement of

23  material fact which was, at the time and in light of the circumstances under which it was made, false

24  or misleading, or which omits a statement of material fact necessary to make the statements made,

25  in light of the circumstances under which they are made, not misleading.

26    92.    California Corporation Code §25500 provides that any person who willfully

27  participates in any transaction in violation of §25400(d) shall be liable to any other person who

28  purchases any security at a price that was affected by such transaction.

93.     California Corporations Code §25403 provides that any person who knowingly provides substantial assistance to any person in violation of §25400, among other sections, shall be liable to the same extent as the person committing the violation.

94.     Defendants' misrepresentations and omissions of material fact took place "within the state" of California within the meaning of Corp. Code §25008.

95.     Defendants' conduct constitutes a violation of California corporations Code §§25400, 25403 and 25500.

96.     As a direct and proximate result of Defendants' conduct Plaintiff has suffered damages.

97.     Unless enjoined by this Court, Defendants will continue to violate Section 25400.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on her own behalf and on behalf of the Class, prays for judgment as follows:

(a)     Determining this action to be a proper class action;

(b)     Certifying Plaintiff as class representative under California Code of Civil Procedure Section 382 and appointing Block & Leviton and Cotchett, Pitre & McCarthy, LLP as counsel to the Class;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon and prejudgment interest at the maximum legal rate per annum;

(c)     Awarding Plaintiff the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiff's attorneys and experts; and

(d)     Granting such other and further relief as the Court may deem just and proper, including but not limited to rescission, refund of monies paid and the disgorgement of ill-gotten monies.

1                  **VIII.  JURY TRIAL DEMANDED**

2      Plaintiff hereby demands a trial by jury.

3

4     DATED:  March 04, 2013            Respectfully submitted,

5                             **COTCHETT, PITRE & McCARTHY, LLP**

6                             By: _____

7                                   MATTHEW K. EDLING

8                             840 Malcolm Road, Suite 200

9                             Burlingame, CA 94010
                              Telephone: (650) 697-6000

10                          Facsimile: (650) 697-0577

11                           **BLOCK & LEVITON LLP**

12                           Jeffrey C. Block
                            Whitney E. Street

13                           Leigh E. O'Neil
                           155 Federal Street, Suite 1303

14                          Boston, MA  02110
                          Telephone:  (617) 398-5600

15                          Facsimile:  (617) 507-6020

16

17                          *Counsel for Plaintiff* Judith Woodruff,
                          Individually and on behalf of all others

18                          similarly situated

19

20

21

22

23

24

25

26

27

28

**EXHIBIT B**

 **CT Corporation**

**Service of Process Transmittal**
03/12/2013
CT Log Number 522304663

**TO:**   Katrina Smith Muirhead, North Carolina Certified Paralegal
DLA Piper US LLP
4141 Parklake Avenue, Suite 300
Raleigh, NC 27612-2350

**RE:**   **Process Served in Delaware**

**FOR:**   KBS Holdings LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Judith Woodruff, etc., Pltf. vs. KBS Real Estate Investment Trust, Inc., et al. including KBS Holdings LLC, Dfts |
| **DOCUMENT(S) SERVED:** | Summons, Cover Sheet, Notice(s), Complaint, Stipulation, Statement(s), ADR Form |
| **COURT/AGENCY:** | Marin County - Superior Court - San Rafael, CA Case # CIV1300964 |
| **NATURE OF ACTION:** | Plaintiff seeking relief for the breach committed by the defendant - Violation of Cal Corp. Code 25401 and 25501 |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/12/2013 at 14:35 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 Calender days |
| **ATTORNEY(S) / SENDER(S):** | Matthew K. Edling Cotchett, Pitre, & McCarthy, LLP 840 Macolm Road Suite 200 Burlingame, CA 94010 |
| **REMARKS:** | Please note the process server underlined and/or highlighted the entity being served prior to receipt by CT. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 799274596013 |
| **SIGNED:** **PER:** **ADDRESS:** | The Corporation Trust Company Scott LaScala 1209 Orange Street Wilmington, DE 19801 |
| **TELEPHONE:** | 302-658-7581 |

Page 1 of  1 / RP

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 CT Corporation

**Service of Process Transmittal**
03/12/2013
CT Log Number 522305691

**TO:** Katrina Smith Muirhead, North Carolina Certified Paralegal
DLA Piper US LLP
4141 Parklake Avenue, Suite 300
Raleigh, NC 27612-2350

**RE:** **Process Served in Delaware**

**FOR:** KBS Capital Advisors LLC (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Judith Woodruff, etc., Pltf. vs. KBS Real Estate Investment Trust, Inc., et al. including KBS Capital Advisors, LLC, Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Notice(s), Cover Sheet, Complaint, Stipulation, Application, Statement(s), Form |
| **COURT/AGENCY:** | Marin County - Superior Court - San Rafael, CA Case # CIV1300964 |
| **NATURE OF ACTION:** | Small Claims - plaintiff, on her own behalf and on behalf of the class, prays for judgment against defendants for the damages sustained as a result of the wrongdoings of defendants |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/12/2013 at 14:35 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service - Answer Complaint // Within 60 days of the filing date of this complaint - File case management conference statement form and ADR information Package // Within 30 days of service - File Responsive pleadings (Kindly see documents for additional information) |
| **ATTORNEY(S) / SENDER(S):** | Matthew K. Edling Cotchett, Pitre & McCarthy, LLP 840 Malcolm Road, Suite 200 Burlingame, CA 94010 650-697-6000 |
| **REMARKS:** | Please note the process server underlined and/or highlighted the entity being served prior to receipt by CT. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via Fed Ex 2 Day , 799275458108 |
| **SIGNED:** PER: ADDRESS: TELEPHONE:** | The Corporation Trust Company Scott LaScala 1209 Orange Street Wilmington, DE 19801 302-658-7581 |

Page 1 of  1 / MS

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 **CT Corporation**

**Service of Process Transmittal**
03/12/2013
CT Log Number 522301117

**TO:**  Katrina Smith Muirhead, North Carolina Certified Paralegal
DLA Piper US LLP
4141 Parklake Avenue, Suite 300
Raleigh, NC 27612-2350

**RE:**  **Process Served in California**

**FOR:**  KBS Capital Markets Group LLC (Domestic State: CA)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Judith Woodruff, individually and on behalf of all others similarly situated, Pltf. vs. KBS Real Estate Investment Trust, Inc., et al. including KBS Capital Markets Group, Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | Summons, Class Action Complaint, Cover Sheet, Notice of Case Management Conference, Notice(s), Stipulation, Ex Parte Application, Case Management Statement, Proof(s) of Service, Statement, ADR Information Form |
| **COURT/AGENCY:** | Marin County - Superior Court - San Rafael, CA Case # CIV1300964 |
| **NATURE OF ACTION:** | Breach of Fiduciary Duty of Loyalty |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Los Angeles, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/12/2013 at 14:45 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service - File written response // 5/15/2013 at 9:00 a.m. - Hearing on Failure to File Proof of Service // 6/14/2013 at 9:00 a.m. - Hearing on Failure to Answer // 7/25/2013 at 9:00 a.m. - Case Management Conference // 7/10/2013 - File Case Management Statement // At least 15 days before the CMC - File and serve Case Management Conference Statement |
| **ATTORNEY(S) / SENDER(S):** | Matthew K. Edling Cotchett, Pitre & McCarthy, LLP 840 Malcolm Road Suite 200 Burlingame, CA 94010 650-697-6000 |
| **REMARKS:** | As per the records of the California Secretary of State the only company registered to do business in the State of California beginning with KBS Capital Markets Group is KBS Capital Markets Group LLC. Please note that Page 2 of the Cover Sheet was not received with the documents at the time of service. |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  Fed Ex 2 Day , 799269390514 |
| **SIGNED:** | C T Corporation System |
| **PER:** | Nancy Flores |
| **ADDRESS:** | 818 West Seventh Street Los Angeles, CA 90017 |
| **TELEPHONE:** | 213-337-4615 |

Page 1 of  1 / JL

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**EXHIBIT C**

3/12/13 2:41p

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

<table>
<tr><td>

**NOTICE TO DEFENDANT:** KBS Real Estate Investment
*(AVISO AL DEMANDADO):* Trust, Inc.; KBS Holdings, LLC;
KBS Capital Markets Group; KBS Capital Advisors, LLC;
Peter M. Bren; Charles H. Shreiber, Jr; Keith Hall;
Peter McMillan III; David E. Snyder and Does 1
through 50.


**YOU ARE BEING SUED BY PLAINTIFF:** Judith Woodruff,
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):* Individually and on
behalf of all others similarly situated

</td><td>

**FOR COURT USE ONLY**
*(SOLO PARA USO DE LA CORTE)*

FILED

MAR - 5 2013

KIM TURNER, Court Executive Officer
MARIN COUNTY SUPERIOR COURT
By J. Dale, Deputy

</td></tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

<table>
<tr><td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
Superior Court of California, County of Marin
3501 Civic Center Drive
P.O. Box 4988
San Rafael, California 94903

</td><td>

**CASE NUMBER:**
*(Número del Caso):* CM300964

</td></tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Matthew K. Edling, SBN 250940
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010

**J. DALE**

<table>
<tr><td>DATE: March 5, 2013<br>*(Fecha)*</td><td>Clerk, by _____<br>*(Secretario)*</td><td>, Deputy<br>*(Adjunto)*</td></tr>
</table>

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

<table>
<tr><td>[SEAL]</td><td>

1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [X] on behalf of *(specify):* KBS Capital Markets Group

   under: [X] CCP 416.10 (corporation)    [ ] CCP 416.60 (minor)
        [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
        [ ] CCP 416.40 (association or partnership)  [ ] CCP 416.90 (authorized person)
        [ ] other *(specify):*

4. [ ] by personal delivery on *(date):* 3/12/13

</td></tr>
</table>

**SUMMONS**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

Legal Solutions  Plus

Code of Civil Procedure §§ 412.20, 465

Page 1 of 1

**EXHIBIT D**

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*
Matthew K. Edling, SBN 250940
Cotchett, Pitre & McCarthy, LLP
840 Malcolm Road, Suite 200

Burlingame, CA 94010
TELEPHONE NO.: (650) 697-6000   FAX NO.: (650) 697-0577
ATTORNEY FOR *(Name):* Plaintiff

RECEIVED

MAR - 5 2013

MARIN COUNTY
SUPERIOR COURT

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Marin
STREET ADDRESS: 3501 Civic Center Drive
MAILING ADDRESS: P.O. Box 4988
CITY AND ZIP CODE: San Rafael, California 94903
BRANCH NAME:

CASE NAME: Woodruff et al. v. KBS Real Estate
Investment Trust, Inc., et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: CIV 1 3 0 0 9 6 4 |
|---|---|---|---|---|
| [x] Unlimited (Amount demanded exceeds $25,000) | [ ] Limited (Amount demanded is $25,000 or less) | [ ] Counter | [ ] Joinder | |
| | | Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | | JUDGE: LYNN DEPT: |

*Items 1-6 below must be completed (see instructions on page 2).*

**1. Check one box below for the case type that best describes this case:**

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400-3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[x] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

**2.** This case [x] is [ ] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. [x] Large number of separately represented parties     d. [x] Large number of witnesses
b. [ ] Extensive motion practice raising difficult or novel     e. [ ] Coordination with related actions pending in one or more courts issues that will be time-consuming to resolve        in other counties, states, or countries, or in a federal court
c. [x] Substantial amount of documentary evidence     f. [ ] Substantial postjudgment judicial supervision

**3.** Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive

**4.** Number of causes of action *(specify):* 1. Breach of Fiduciary Duty, 2.Violation of Cal.Corp.Code §§ 25401 and 25501, 3. Violation of Cal. Corp. Code §§25400, 25403, and 2550

**5.** This case [x] is [ ] is not a class action suit.

**6.** If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: March 4, 2013
Matthew K. Edling, SBN 250940
(TYPE OR PRINT NAME)                                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Legal
Solutions
Plus

Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10